## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **A.S. *et al.*,** | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COLONIAL SCHOOL DISTRICT,** | : | |
| *Defendant* | : | **No. 21-3952** |

### MEMORANDUM

PRATTER, J.                                              JULY 8, 2022

A.S. is a third grader with autism spectrum disorder. The sole psychologist to examine him recommended that he spend first grade at The Center School, a private school which had a small classroom with peers not on the spectrum whom A.S. could mimic. The School District initially agreed to send A.S. to The Center School. But, once the hearing officer told the District that it did not have to send A.S. there, the District revoked its assent. Following the psychologist's recommendation, the parents moved A.S. to The Center School. The parents now seek full tuition reimbursement. The Court grants their request. The parties had an agreement to send A.S. to The Center School, which the District breached, and the public-school alternative placement offered by the District directly conflicted with the psychologist's specific recommendations. The equities favor full tuition reimbursement.

### BACKGROUND

#### A. The psychologist recommends placing A.S. at the Center School

As a child with a disability, A.S. is entitled to free special education under the Individuals with Disabilities Education Act (or IDEA), 20 U.S.C. § 1400 *et seq.* From pre-kindergarten to first grade, A.S. received that special education at the Meadowbrook School. He spent the first half of the day in a regular classroom and the second half in a pull-out classroom run by A Step Up Academy, where he received applied behavioral, speech, and occupational therapy.

For first grade, Colonial School District tried to move A.S. to the local public elementary school. The parents filed a due-process complaint. Finding that the District's evaluation of A.S. had been "prejudicially flawed," the hearing officer ordered that A.S. remain at Meadowbrook, at the District's expense, and ordered that A.S. undergo an independent educational evaluation, or IEE.

Dr. Angela Jones, a school psychologist, conducted the IEE. She spoke with A.S.'s parents and educators at Meadowbrook and A Step Up Academy and to teachers at Whitemarsh Elementary School, the local public school. She observed A.S. at school and at summer camp, and she conducted nine different assessments. In her final report, she recommended that A.S. be placed in a small class, of no more than 12 students, at a specialized school, and not be rotated between a regular and special education classroom throughout the day, as he had been at Meadowbrook. Dr. Jones suggested The Center School, a small elementary school that specialized in students with learning disabilities.

Dr. Jones had not finished her report by the start of the school year. In the absence of the report, the District updated A.S.'s Individual Educational Placement, or IEP, moving him from Meadowbrook to Whitemarsh Elementary School. The parents disagreed with this placement and filed a due process complaint. This complaint meant that A.S. had to "stay put" at Meadowbrook.

Once Dr. Jones issued her report, the District issued a second updated IEP offering A.S. placement at The Center School *or* Whitemarsh Elementary School, noting that "while [it] believes that A.S.'s IEP can be delivered at Whitemarsh Elementary School, [it] will support th[e] recommendation [for The Center School]." Doc. No. 10-10, at 72.

### B.  The parties agree to place A.S. at The Center School

Once Dr. Jones recommended that A.S. be placed at The Center School, the District proposed moving A.S. there immediately. Thinking this would be too disruptive, the parents proposed moving A.S. in the fall but keeping him at Meadowbrook through the summer. The parents then informed the hearing officer of this agreement, and the parties "jointly" asked that the hearing be limited to the summer placement. Doc. No. 10-12, at 23.

Meanwhile, the parties attempted to put this agreement on paper. The District had issued a Notice of Recommended Educational Placement listing A.S. as starting at The Center School in the summer. The parents requested that the District issue a new NOREP placing A.S. at The Center School in the fall but saying nothing about the summer placement. The District refused, suggesting that the parents should just mark up the current NOREP to note the parts they accept and reject. The hearing officer then weighed in, telling the parties that he would have to see a signed NOREP "to moot any issue in the hearing." Doc. No. 10-12, at 23. The parents, reiterating that the parties had reached an agreement, explained that they had not yet signed the NOREP because they did not want to inadvertently waive their objections to the summer placement.

Meanwhile, the District asked the parents to consent to sending A.S.'s records to The Center School. Two days later, the District asked again for consent. The next day, the District repeated its request. The mother told the school she would review the consent form and "get back" to the District.

A week later, the parties attended the due process hearing. Days after the hearing, the parents reached out to The Center School to get A.S. enrolled. A few weeks later, the mother gave the District permission to share A.S.'s information with The Center School.

### C. The hearing officer does not consider placement at The Center School

The next day, the hearing officer issued his opinion. He reasoned that, because the parents had not signed the NOREP or consented to release A.S.'s records, he could not even consider placement at The Center School. He then found that the learning support classroom at Whitemarsh Elementary School was an appropriate placement for A.S.

Surprised, the parents asked the District to affirm their prior agreement to place A.S. at The Center School. The District disavowed any such agreement. The parents appealed the hearing officer's decision to this Court. Pending the appeal, they placed A.S. at The Center School at their own expense.

On appeal, this Court vacated and remanded. *A.S. v. Colonial Sch. Dist.*, 19-cv-2741, 2020 WL 6784350, at *1 (E.D. Pa. Nov. 18, 2020). The hearing officer had not given the parents an opportunity to explain why they had not yet signed the NOREP or consented to the release of A.S.'s records. *Id.* at *7. Plus, the hearing officer had decided that A.S. could receive an appropriate education at Whitemarsh based on testimony from a single witness for the District, and without considering The Center School as an alternate placement. *Id.* at *8–9. The Court remanded for the hearing officer to further develop the factual record. *Id.* at *11.

### D. The hearing officer finds The Center School to be an inappropriate placement

On remand, the hearing officer heard evidence on whether the parties had an agreement to place A.S. at The Center School and, even if they did not, whether the parents should be reimbursed for the tuition they paid to The Center School. The parents explained that they had not signed the consent form before the hearing because the mother's parents had both been in the hospital and she had to frequently travel out of town to take care of them.

The hearing officer once again ruled for the District. Sidestepping the issue of the agreement, he decided that the parents did not deserve tuition reimbursement. He found that Whitemarsh was an appropriate placement for A.S., and that The Center School was not, because A.S. received no special education there. He also found that the equities did not weigh in either party's favor, though he did fault the parents for not consenting to the NOREP.

The parents once again appealed to this Court. Both sides have filed cross-motions for judgment on the administrative record. A.S. has since finished his year at The Center School. He now attends Whitemarsh Elementary and is doing well in the learning support classroom there.

### LEGAL STANDARDS

Under the Individuals with Disabilities Education Act, every child with a disability is entitled to a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). To ensure this so-called FAPE, school districts must provide each child with an individualized educational program, or IEP, that is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

A student with disabilities should be educated with non-disabled peers as much as possible, in the so-called "least restrictive environment." 34 C.F.R. § 300.114(a)(2); *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1209 (3d Cir. 1993). Thus, districts must first consider if the child can be educated in the regular classroom with "supplementary aids and services." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000) (quoting *Oberti*, 995 F.2d at 1215). If not, the student can be placed in a special education classroom, such as an autistic support classroom or a learning support classroom. Still, the district must have "made efforts to include the child in school programs with nondisabled children whenever possible." *Id.*

5

Once a child is identified as potentially needing special education, the district must evaluate the child and implement an IEP. 20 U.S.C. § 1414(a)(1). From that point, the district must provide regular reevaluations of the child's needs and placement. § 1414(a)(2).

Upon the parents' request, the child must undergo an independent educational evaluation (IEE) at no expense to the parents. 34 C.F.R. § 300.502(a)(1). This IEE must be performed by a "qualified examiner" not employed by the district. § 300.502(a)(3)(i). Using "technically sound" tests, 20 U.S.C. § 1414(b)(2)(C), the examiner assesses "the nature and extent of the special education and related services that the child needs," 34 C.F.R. § 300.15.

With the IEE in hand, the IEP team decides the appropriate educational placement for the child. 20 U.S.C. § 1414(b)(4)(A). This team is comprised of school officials, teachers, the independent evaluator, and the parents. § 1414(d)(1)(B). The team "[*m*]*ust*" consider the IEE, 34 C.F.R. § 300.502(c)(1) (emphasis added), and should consider standardized tests, information from the parents, and observations made by the student's past and current teachers. 20 U.S.C. § 1414(c)(1)(A).

Once the IEP team settles on the recommended educational placement, the district provides the parents with written notice of this placement. 20 U.S.C. § 1415(b)(3). In Pennsylvania, districts do so by issuing a Notice of Recommended Educational Placement (or NOREP) for the parents to sign and return. *T.R. v. Sch. Dist. of Phila.*, 223 F. Supp. 3d 321, 325 (E.D. Pa. 2016). If this is the student's first IEP, the parents must consent for the district to place the student in special education. 20 U.S.C. § 1414(a)(1)(D)(ii)(II). Otherwise, if the district is revising the student's IEP, the district may proceed with the revision without the parents' consent unless the parents file a due process complaint with a state or local educational agency.

Following a due process complaint, the parents and school district attend a due process hearing, at which the parties put on evidence about the child's educational needs and the potential placement options. 22 Pa. Code. § 14.162(b). Based "upon the substantial evidence presented," the hearing officer decides the appropriate school for the child. § 14.162(f). If the parents appeal that decision, the district court conducts a modified *de novo* review, reviewing the record, hearing additional evidence if needed, and deciding the "appropriate" relief based "on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(c). The court defers to the hearing officer's findings of fact and credibility but can reject those findings if the "extrinsic evidence in the record … or … the record read in its entirety … compel[s] a contrary conclusion." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (internal quotation marks omitted).

DISCUSSION

The parents here assert that they had a settlement agreement with the District to send A.S. to The Center School. The District disavows any such agreement. It also argues that, though it had been willing to place A.S. at The Center School, The Center School was actually an *in*appropriate placement for A.S. after all. The District is wrong on both fronts: The District had a settlement agreement with the parents, and it breached that agreement when it backtracked on its promise to pay tuition. And the only psychologist to evaluate A.S. recommended that he be placed at The Center School, not Whitemarsh. The parents are thus entitled to full tuition reimbursement for A.S.'s year at The Center School.

In many cases, the district can provide a FAPE at a public school in the district, through special-education programs, pull-out classes, in-class aides, counseling, therapy, and the like. If it cannot, the district must pay for the student to attend a private school that will serve his needs. 20

U.S.C. § 1412(a)(10)(B)(i). If the district refuses to pay, the parents may enroll the child at the private school and then seek tuition reimbursement in court. § 1412(a)(10)(C)(ii).

Tuition reimbursement is an equitable remedy, assessed using the *Burlington-Carter* three-part test. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993). First, does the public-school placement offered by the district provide the student with an appropriate education? Second, is the private school chosen by the parents "proper" for the student, such that the private school "provides significant learning and confers meaningful benefit … in the least restrictive educational environment"? *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007) (internal quotation marks omitted). Third, do the equities favor reimbursement? If so, the district court has "broad discretion" to grant relief and can order full or partial tuition reimbursement or fashion other equitable remedies. *Burlington*, 471 U.S. at 369.

## I. Whitemarsh, the public elementary school, was not an appropriate placement for A.S.

The District offered A.S. a placement at Whitemarsh, a local public elementary school, but that placement would not have provided A.S. with an appropriate education given his needs at the time.

For parents to unilaterally place their child in private school, the offered public school placement must have been inappropriate, such that it was not "the least restrictive educational environment" or that it would not "provide[ ] significant learning and confer[ ] meaningful benefit" on the student. *Lauren W.*, 480 F.3d at 276. The placement does not have to "maximize[ ] the child's potential," but it must ensure that the student makes notable academic and social progress. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010).

Dr. Jones performed an Independent Educational Evaluation on A.S. and, based on his needs and abilities, narrowed down his schooling options. A.S. should not be placed "in an Autistic Support classroom," or a class made up exclusively of students with autism. Doc. No. 10-11, at 39. A.S. "mimic[s] the behaviors and functioning of surrounding peers," meaning that he should be "among peers who do not have autism" who can "offer social and language modeling" for A.S. *Id.* When A.S. had previously been in an Autistic Support classroom, "his behavior and overall functioning ha[d] regressed." *Id.*

Dr. Jones also opined that A.S. should not be placed in a large classroom. He was easily distracted, and he often became overstimulated, even with the help of a personal aide. ***Id.*** Thus, his class should be "small," with no more than 9 to 12 students. *Id.* In Dr. Jones's opinion, A.S.'s class should also be stable. So he should not be put in a general education classroom with "pull-out supports." *Id.* at 40. The constant transitions would "fragment[]" his day, and he would not receive the necessary "positive modeling from peers." *Id.* Nor should he be put a Learning Support classroom, where students with different disabilities rotate in and out through the day, for A.S. would not do well with a "fluid peer group." *Id.* at 39.

The District offered to place A.S. at Whitemarsh Elementary School. There, he would spend homeroom, lunch, recess, and specials (like art and physical education) in a general education classroom with 20 to 25 other students. For reading, writing, and math, he would transition to the Learning Support classroom with other students with disabilities.

This placement directly contradicted Dr. Jones's recommendations. Dr. Jones specifically opined that A.S. should not be in a general education classroom over 12 students or a Learning Support classroom, much less rotate between the two. In her opinion, A.S. needed a small, consistent class of peers throughout the day, so that all students shifted lessons at the same time

and moved classrooms together, so as to avoid distraction and sensory overload. The placement at Whitemarsh, just like his prior placement at Meadowbrook, did not meet those requirements.

Dr. Jones was the sole expert to evaluate A.S. She conducted a thorough review of all relevant materials, and she formed her opinions based on information from those who worked with A.S. and her own first-hand observations and assessments. Her qualifications and her methodologies have not been contested. No other expert has contradicted or questioned her opinions. *Cf. Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199–200 (3d Cir. 2004).

Districts often turn to outside educational experts to help decide the proper placement for students with disabilities. In fact, districts must, on a parent's request, have an outside expert conduct an independent educational evaluation of the student. 20 U.S.C. § 1415(b)(1); 20 C.F.R. 300.502. Districts are not bound by this independent evaluation, but they *must* consider it and provide a reasoned explanation if they reject it. 34 C.F.R. § 300.502(c)(1); *see D.S.*, 602 F.3d at 566 n.7.

Here, the District has not articulated a single reason for the Court to disregard Dr. Jones's independent expert opinion that A.S.'s educational needs could not be met in a general education or learning support classroom. To the contrary, the District initially intended to follow Dr. Jones's opinion.

Nor has the hearing officer articulated why he rejected Dr. Jones's expert opinion. On remand, the hearing officer found that the proposed program at Whitemarsh Elementary would have given A.S. the opportunity to "engage regular education peers" in "the least restrictive environment" of his "neighborhood school." Doc. No. 10-3, at 16–17. To the hearing officer, the frequent transitions between the general education classroom and the Learning Support classroom posed no problem because A.S.'s "transitions would be managed and regular ... and not on an *ad*

*hoc* basis." *Id.* If the transitions did become a problem, the hearing officer speculated that A.S. could "remain entirely in the [Learning Support] classroom." *Id.* at 17.

In coming to this conclusion, the hearing officer did not discuss Dr. Jones's recommendation, much less point to evidence in the record that contradicted or undermined Dr. Jones's opinion or her credibility. Instead, the hearing officer rested on the observations of Debra Quaco, the teacher who runs Whitemarsh's learning support classroom. *Id.* at 13.

Ms. Quaco is A.S.'s current learning support teacher at Whitemarsh. Though an experienced teacher, Ms. Quaco never examined A.S. prior to his going to The Center School. On remand, at the second due-process hearing, Ms. Quaco testified that—based only on her experience with A.S. as a third grader—she thought A.S. would have done well in the learning support classroom the prior year.

The hearing officer credited Ms. Quaco's hindsight speculation over Dr. Jones's contemporaneous recommendation. Yet the appropriateness of a placement must be measured at the time it is to be implemented, not when the school year is finished. *D.S.*, 602 F.3d at 564–65. That A.S. is currently doing well in Ms. Quaco's classroom—after he spent a year making notable progress at The Center School—does not mean that A.S. would have done well in Ms. Quaco's classroom without his year spent at The Center School. Hindsight cannot be used "to second-guess" an expert recommendation "that was reasonable at the time." *K.D. ex rel. Dunn v. Downington Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018).

The Court gives due respect to a hearing officer's findings. But those findings must supported by "substantial evidence." 22 Pa. Code. § 14.162(f). And, just like courts, hearing officers cannot "substitute their own notions of sound educational policy" for those on the ground with the students. *Endrew F.*, 137 S. Ct. at 1001. Dr. Jones observed A.S., conducted tests, and

spoke with his teachers and parents. Yet the hearing officer did not address Dr. Jones's expert opinion in any meaningful way. So the Court cannot defer to the hearing officer's finding that Whitemarsh Elementary served as an appropriate placement for A.S.

That leaves Dr. Jones's independent expert opinion that a program like that offered at Whitemarsh Elementary was not appropriate for A.S. at that time. The District has articulated no reason—below or on appeal—to reject that opinion. The Court sees none in the record. The Court thus finds that the Whitemarsh placement was inappropriate.

## II.   The Center School was an appropriate placement for A.S.

For tuition to be reimbursed, the private school placement must also have been appropriate. *Lauren W.*, 480 F.3d at 276. This placement need not be "perfect," so long as "it provides significant learning and confers meaningful benefit." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 242 (3d Cir. 2009) (internal quotation marks omitted).

The Center School "specialized in children that had language deficienc[ies] … and needed to learn at a slower pace." Mar. 8, 2019 Hr'g Tr. 32:17–21, Doc. No. 10-8. The classes were small; A.S. was one of seven students in his class, and he received significant attention from his teacher. A.S. stayed with his same classmates all day, and they all transitioned together to recess, gym, and art class. His education was not "fragment[ed]," and he had "a stable group of peers" not on the spectrum who served as "language and social models" for him. May 17, 2021 Hr'g Tr. 301:9–25, Doc. No. 10-6. The class was also quiet, which prevented A.S. from becoming overstimulated or distracted. A.S. did "well" in this environment, as he engaged comfortably with his peers, improved in his reading and math, and even showed "some independence." *Id.* at 267:22–24, 271:22–24. In sum, The Center School educated A.S. in "the least restrictive educational environment," and he received "significant learning" and "meaningful benefit" from his education.

*Lauren W.*, 480 F.3d at 276; *see Norristown Area Sch. Dist. v. F.C.*, 636 F. App'x 857, 863 & n.13 (3d Cir. 2016).

This was the exact educational environment that had been recommended by Dr. Jones. On remand, Dr. Jones affirmed that The Center School had actually met A.S.'s educational needs. Her opinion carries considerable weight: no other witness suggested that The Center School did not provide A.S. with an appropriate education.

And though the District now argues against The Center School, the District had initially been more than willing to place A.S. there. Karen Berk, the District's director of special education, had even opined at the first due process hearing that she thought that The Center School *was* an appropriate placement for A.S.:

> Q: [D]o you believe the District's proposal to place [A.S.] at the Center School is appropriate?
> A: I do.
> Q: And why?
> A: I believe that, again, the class size, the methodology of delivery of instruction that they use at the Center School, the fact that [A.S.] would be less aide-dependent there is—actually works to his benefit. He would be surrounded by typical peers. ... So yeah, I think it would be a good setting for [A.S.]. I do agree with Dr. Jones in that.

Mar. 8, 2019 Hr'g Tr. 90:9–91:17, Doc. No. 10-8. Six other District officials had agreed in A.S.'s IEP, stating that they "support [Dr. Jones's] recommendation" that A.S. go to The Center School. Doc. No. 10-10, at 72.

Despite Dr. Jones's opinion and the District's concurrence, the hearing officer decided as a matter of law that The Center School could not have been an appropriate placement because it did not provide "special education" to A.S., and his teacher was not a "special education" teacher, though it might be "a pleasant place for schooling." Doc. No. 10-3, at 19–20. But The Center School did not have to be "licensed to provide special education programming," or even "provide an IEP" to A.S., so long as it met his educational needs. *Lauren W.*, 480 F.3d at 276. A.S.'s parents

had unilaterally placed him at The Center School. So his education was not "under public supervision and direction," and his education did not have to meet all the procedural requirements of a public school placement, like implementing an IEP. *Florence Cnty. Sch. Dist.*, 510 U.S. at 13 (internal quotation marks omitted). So long as A.S. "ma[de] progress in reaching [his] academic, social, and behavioral goals"—which he undisputedly did—The Center School counts as an appropriate placement. *Lauren W.*, 480 F.3d at 277.

### III.    The equities favor tuition reimbursement

Having found that The Center School was an appropriate placement and Whitemarsh was not, the Court next must weigh the equities. Here, the equities heavily favor the parents. Going into the due-process hearing, the parties had all agreed that A.S. would be at The Center School that fall. Once the hearing officer disregarded that agreement, the District took the opportunity to back out of its obligation, breaching the settlement agreement in the process. In short, the parents did not act "unreasonabl[y]"; the District did. 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

Parents and school districts can enter settlement agreements to resolve educational placements. *D.R. by M.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 898 (3d Cir. 1997); *H.E. v. Palmer*, 220 F. Supp. 3d 574, 577 (E.D. Pa. 2016). These settlement agreements are governed by state contract law. *Lejeune v. Khepera Charter Sch.*, 327 F. Supp. 3d 785, 795 (E.D. Pa. 2018).

Settlement agreements under the IDEA fall into two categories: formal and informal. Once a parent files a due-process complaint, the IDEA mandates that the parents and district attend a mediation. 20 U.S.C. § 1415(f)(1)(B)(i). If the parties resolve their issues at that mediation, they must memorialize the settlement agreement in a written document signed by both parties. § 1415(f)(1)(B)(iii). This is a formal settlement agreement. If the parties settle outside this statutorily mandated mediation, it is an informal settlement agreement.

Under the IDEA, formal agreements can be enforced in state or federal court. 20 U.S.C. § 1415(f)(1)(B)(iii)(II). But the IDEA has no analogous enforcement provision for informal settlement agreements. District courts cannot "confer jurisdiction on [themselves] where Congress has not done so." *Bowman v. District of Columbia*, No. 5-cv-1933, 2006 WL 2221703, at *2 (D.D.C. Aug. 2, 2006). Informal settlement agreements thus must be enforced in a state court with general jurisdiction over contract disputes.

The parents here contend that the parties reached an informal settlement agreement prior to the due-process hearing. Though this Court does not have subject matter jurisdiction to "directly enforce [any such] informal settlement agreement[ ]," *H.E.*, 220 F. Supp. 3d at 577, the Court can still consider the existence of this agreement—and any breach of it—in weighing the equities under *Burlington-Carter*.

The existence of a contract is an issue of fact. *See Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 130 (3d Cir. 1997). And the Court must give due weight to the hearing officer's findings of fact. Though he never explicitly stated it, the hearing officer implicitly suggested that the parents and the District did not reach a settlement agreement prior to the due process hearing. But "the record read in its entirety ... compel[s] a contrary conclusion." *S.H.*, 336 F.3d at 270.

## A. The District and parents had a meeting of the minds to place A.S. at The Center School for the next school year

To form a contract, one party must make an offer, which the other party must accept through words or conduct. Once an agreement has been reached, the parties may put that agreement into a formal writing, but they do not have to. So long as "the minds of the parties met and the

essential provisions of the contract were agreed upon, the contract was created." *Flight Sys.*, 112 F.3d at 129. "[T]he later writing is simply evidence of the agreement." *Id.*

Here, the parties had gone beyond "merely negotiating" and had reached a meeting of the minds. *Nakles v. Union Real Estate Co. of Pittsburgh*, 204 A.2d 50, 51 (Pa. 1964). The District issued a NOREP offering to send A.S. to The Center School for the next school year. Doc. No. 10-11, at 108. In an email from counsel, the parents accepted this portion of the NOREP. Doc. No. 10-10, at 1. The parties had agreed on all the essential terms: A.S. would attend The Center School for the next school year, and the District would pay for it. And the agreement was supported by consideration: in exchange for the district paying tuition, the parents would drop that portion of their due process complaint against the District. *Cf. I.K. ex rel. B.K. v. Sch. Dist. of Haverford Twp.*, 961 F. Supp. 2d 674, 685–86 (E.D. Pa. 2013).

The parties' post-agreement conduct confirmed that "they intended to be bound by the agreement." *Am. Leasing v. Morrison Co.*, 454 A.2d 555, 560 (Pa. Super. Ct. 1982). The District represented that it would "send a referral to Center School by early next week," and it requested that the parents grant permission for the District to share A.S. records with The Center School. Doc. No. 10-10, at 15. The parents then emailed the hearing officer to inform him that the parties had reached this agreement; the District did not contradict this representation. In other words, the parties both "thought [they] had a contract [and] acted like [they] had a contract." *Fenestra, Inc. v. John McShain, Inc.*, 248 A.2d 835, 837 (Pa. 1969).

### B.  This settlement agreement did not have to be in writing to be enforceable

To be sure, as both the hearing officer and the District emphasize, the parents had not yet actually signed a NOREP before the due-process hearing. The absence of such a formal writing, however, does not mean that the settlement agreement is unenforceable. For one, though the

District now faults the parents for not signing the NOREP, the District is at least partially, if not primarily, to blame for that. The NOREP that the District issued did not accurately reflect the scope of the parties' agreement. The NOREP placed A.S. at The Center School for both the upcoming school year and summer school, but the parents had not agreed to the summer placement. Fearing that they would lose their right to challenge the summer placement if they signed the entire NOREP, the parents requested a revised NOREP that listed just the placement for the upcoming school year. The District refused. So the parties went into the due-process hearing with a settlement agreement but no signed NOREP. Having erected a barrier to a signed NOREP, the District cannot now complain about its absence.

Besides, the parents did not have to sign a NOREP before the due-process hearing in order to rest on the settlement agreement. Prior to moving a student to a new placement, the district must provide notice to the parents and obtain their consent. 34 C.F.R. § 300.503(a). Pennsylvania districts do so by issuing a NOREP for the parents to sign and return. *T.R.*, 223 F. Supp. 3d at 325. If the parents do not sign the NOREP, the school proceeds with the proposed placement, unless the parents file a due-process complaint.

Though the District had to issue a NOREP before *actually changing* A.S.'s placement, the District has pointed to no statute, regulation, guidance, or case stating that the parties had to memorialize their settlement agreement in a NOREP prior to the due-process hearing. This Court will not craft such a rule. From a contract perspective, the NOREP is a "mere formality," *Nakles*, 204 A.2d at 51, a written document that "would simply exhibit just what [the parties] agreed upon and understood," *Taylor v. Stanley Co. of Am.*, 158 A. 157, 159 (1932).

Educational settlement agreements do not fall within the statute of frauds. *See* 13 Pa. Cons. Stat. § 2201(a). And though the IDEA requires that so-called "formal" settlement agreements

reached during the statutorily-mandated mediation be put in writing and be signed by both sides, *see* 20 U.S.C. § 1415(f)(1)(B)(iii), the IDEA does not impose a similar requirement for informal settlement agreements reached outside such mediation, *see Bowman*, 2006 WL 2221703, at \*2. Hence, the settlement remains enforceable, even in the absence of a signed NOREP.

### C. The parents did not have to consent to releasing A.S.'s records prior to the due process hearing

The District blames the parents for not immediately consenting to releasing A.S.'s records to The Center School. Without such consent, the District could not share A.S.'s records with The Center School, a condition to A.S. being enrolled. But a short delay in performing a condition of the contract does not mean that the contract is no longer enforceable. The parties reached this settlement agreement in February, and the parents consented to release of the records in April, still months before A.S. was supposed to start at The Center School. The District has not shown how this short delay prevented the District from actually performing its obligations under the settlement agreement.

Nor did the delay in the parents' consenting to release A.S.'s records mean that the parties did not have a meeting of the minds. As the mother testified on remand, she did not recall receiving the first consent form, at a time when her father had been recently hospitalized when the District apparently sent the email. Her mother was hospitalized shortly thereafter, and she made repeated road trips to see the parents over the next month. Because of this ongoing family emergency, she explained, the District's three follow-up requests—made over the course of four days—escaped her notice. In other words, her not signing the forms did not mean that she had not agreed to sending A.S. to The Center School. It simply meant that she had not yet begun performance of that initial phase of the contract.

### D. The proposed partnership between The Center School and a Step Up Academy was not a condition precedent to the agreement

At Meadowbrook Academy, A.S. had received behavioral therapy, speech therapy, and occupational therapy from A Step Up Academy. The Center School primarily specialized in learning disabilities, and did not offer such therapies at the time. To fill this gap, A Step Up Academy had represented to his mother that it was working on a partnership with The Center School, so that A Step Up Academy would come to The Center School to provide therapy. At the first due-process hearing, the mother testified that if The Center School could not partner with A Step Up Academy, that would be a "deal-breaker" for her. Mar. 8, 2019 Hr'g Tr. at 41:10–15, Doc. No. 10-8. That partnership never materialized.

Based on this testimony, the hearing officer found that "the parents were willing to consider a placement at [The Center School] … but only if the student's autism-support services were provided by [A Step Up Academy]." Doc. No. 10-3, at 10. In other words, as the hearing officer saw it, the partnership with A Step Up Academy was a condition precedent.

A condition precedent is an event "that must occur before a duty to perform under a contract arises." *Acme Mkts., Inc. v. Fed. Armored Express, Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994); *see* Restatement (Second) of Contracts § 224. For an event to count as a condition precedent, the parties must have "clearly" intended for performance to depend on the occurrence (or non-occurrence) of the event. *Acme Mkts.*, 648 A.2d at 1220; *see also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1016 (3d Cir. 1980). This joint intent must be objectively manifested through the parties' "words and the surrounding circumstances." *Williston on Contracts* § 38:13 (4th ed. May 2022); *accord Burger King Corp. v. Family Dining, Inc.*, 426 F. Supp. 485, 492 (E.D. Pa. 1977).

Here, the parties did not clearly intend to condition A.S.'s attendance at The Center School upon a partnership with A Step Up Academy. Though the mother might have said the partnership was a deal-breaker, she later explained that she had already agreed weeks earlier to place A.S. at The Center School, without proof of the partnership. *See* Mar. 19, 2021 Hr'g Tr. at 95:22–96:13, Doc. No. 10-7. Indeed, the emails agreeing to placing A.S. at The Center School say nothing about A Step Up Academy. *See Am. Leasing*, 454 A.2d at 560. And days after the hearing, the mother reached out to The Center School to get A.S. enrolled, still with no news of the partnership. On remand, the hearing officer addressed none of these external manifestations of assent.

Instead, the hearing officer rested on the mother's *saying* that she wanted there to be a partnership between the two schools. But one-sided desires do not automatically become conditions, precedent or otherwise. The mother never testified that she *told* the District that she wanted A.S. to continue to receive services from A Step Up Academy at The Center School. And the emails between the parties never mention A Step Up Academy. Thus, the potential partnership between the two schools cannot have been an *agreed-upon* condition.

In sum, the District and the parents had an enforceable settlement agreement to place A.S. at The Center School for the following school year. The District breached that agreement the moment the hearing officer opened the door. The District has continued to deny the existence of the agreement. It has even gone so far as to argue that The Center School was *not* an appropriate placement for A.S.—even though the District was the one that initially offered for A.S. to go there. The Court thus finds that the equities favor the parents and awards full tuition reimbursement.

CONCLUSION

A.S. attended the exact school recommended by the independent expert. The District's proposed public-school placement directly contradicted the expert's recommendation. Plus, the parties had an enforceable agreement to send A.S. to The Center School. The equities thus support full tuition reimbursement. The Court grants A.S.'s motion for judgment on the administrative record and denies the District's cross-motion. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE